**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**Case No. 9:17-CV-80902-Rosenberg/Reinhart**

MWH CONSTRUCTORS, INC.,

    Plaintiff,

v.

BROWN AND BROWN ELECTRIC,
INC.,

    Defendant.
    _____/

BROWN AND BROWN ELECTRIC,
INC.,

    Counter-Plaintiff,

v.

MWH CONSTRUCTORS, INC.,

    Counter-Defendant,
    _____/

## MEMORANDUM OPINION

On August 1, 2017, Plaintiff, MWH Constructors, Inc. ("MWH") brought this diversity action against Defendant, Brown and Brown Electric, Inc. ("B&B") alleging causes of action for Breach of Contract and Contractual Indemnification. DE 1. On October 20, 2017, B&B counterclaimed, alleging a cause of action against MWH for Breach of Contract. DE 22.

The Court held a non-jury trial on Monday, April 2, 2018. At the trial, MWH presented testimony from Mario Gimma, the MWH project manager who managed the Project at issue in this case; Dean Breaux, MWH's chief estimator for all bids in the continental United States;

Gary Ward, an electrician for Curry Controls; and Vincent Riccobono, the construction services manager for Palm Beach County Water Utilities Department. B&B did not present any witnesses.

## FACTUAL FINDINGS

### I. The Project

On February 4, 2014, the Palm Beach County Water Utilities Department (the "County"), as owner, entered into a contract in the amount of $13,896,000.00 with MWH to serve as general contractor for the construction of a two-level water treatment structure and related improvements at 2956 Pinehurst Drive in West Palm Beach, Florida ("the Project"). Pretrial Stip., DE 74 at 2.[1]

The County's contract with MWH provided that time was of the essence and that MWH was provided 480 days to achieve substantial completion, after which MWH would be assessed liquidated damages at the rate of $2,000 per day. Trial Tr. at 150:9–21. The contract also provided that upon reaching substantial completion, MWH was provided an additional 60 days to achieve final completion of the Project, after which MWH would be assessed liquidated damages at the rate of $1,000.00 per day. *Id.* at 10:25–11:9, 150: 22–151:1.

### II. MWH's Subcontract with B&B

On February 27, 2014, MWH entered into a subcontract with B&B (the "Subcontract") in the amount of $1,400,000[2] to perform the electrical work on the Project. Pretrial Stip, DE 74 at

---

[1] The Project consisted of the construction of a two-level filter structure containing granular media filters, enclosed filter gallery, air scour blowers, electrical room, clearwell, transfer pumps, and backwash pumps, construction of a concrete lined backwash water pond and backwash water return pumping station, demolition of existing steel vessel granular media filters, ozone contact tank, and 1 million gallon storage tank, as well as site work, grading, paving, drainage, yard piping, and associated electrical work. Pretrial Stip., DE 74 at 3.

[2] The Subcontract value was later adjusted due to MWH and B&B executing five change orders, which resulted in a Subcontract value of $1,431,950.68. MWH has subsequently agreed to credit

2

3; Ex. 1.

Pursuant to the Subcontract, B&B was required or otherwise agreed to the following:

    a.    to "furnish all manpower, equipment, materials, supplies, plant, services…and all other items" as necessary to complete the electrical work on the Project, Pretrial Stip, DE 74 at 3; Ex. 1 § 2.1;

    b.    to "perform all operations necessary and required for performance and completion of the Work in strict conformity with the provisions of the Subcontract Documents," Pretrial Stip, DE 74 at 3; Ex. 1 § 2.1;

    c.    to "defend, indemnify, and hold harmless [MWH] for, of, and from any loss..[MWH] may sustain by reason of [B&B]'s failure to comply with all laws, rules, and regulations in connection with the performance of this Subcontract," Ex. 1 § 6.1;

    d.    that "[t]ime is of the essence with respect to the performance of the Subcontract," Pretrial Stip, DE 74 at 3; Ex. 1 § 3.1;

    e.    that "[MWH] shall have the right to decide the time and order that various portions of the Work shall be installed," Ex. 1 § 3.4;

    f.    "to prosecute the Work in a prompt and diligent manner…at such time or times as [MWH] may direct," Pretrial Stip., DE 74 at 3; Ex. 1 § 3.1;

    g.    that "[B&B] acknowledges that it was its responsibility to, prior to entering into th[e] Subcontract, to investigate and familiarize itself with…(ii) the availability of personnel, workmen,…and other requirements for the performance of the subcontract" and that "[MWH] shall not be liable to [B&B] on any claim for additional payment or additional time or any other relief if such claim directly or indirectly results from [B&B]'s failure to investigate and familiarize itself sufficiently with the conditions under which this Subcontract is to be performed," Ex. 1 § 12.1;

    h.    to "keep itself thoroughly informed as to the overall progress of the construction project," Ex. 1 § 3.1;

    i.    to "not by delay or otherwise, interfere with or hinder the work or progress of [MWH]" Pretrial Stip., DE 74 at 3; Ex. 1 § 3.1;

    j.    to "notify [MWH] of its objection or inability to comply with any directive, notification, order, schedule or revision thereof dealing with the time or times of

---

B&B for unexecuted Change Order 6, totaling an additional $2,176.84, resulting in a final Subcontract value of $1,434,127.52. Pretrial Stip., DE 74 at 3.

its performance hereof within three (3) days of [MWH]'s issuance thereof. In absence of such notice to [MWH], [B&B] agrees to accept for incorporation herein any and all orders, notices, directives, schedules or revisions thereof which may be issued from time to time by [MWH] to [B&B]" Ex. 1 § 3.1;

k. that "if at any time [B&B] believes that pursuant to applicable provisions in this Subcontract, acts or omissions of [MWH] or Owner constitute a change to the work, [B&B] shall file with [MWH], within three (3) days after occurrence of the circumstances giving rise to the alleged change, a written notice in the form of a change order request…Failure to timely submit the required notice or to keep detailed, segregated time and costs records shall waive any claim by [B&B] to an extension of time or an increase in the Subcontract price. No change or alleged change shall excuse [B&B] from proceeding with the prosecution of the Work," Ex. 1 § 11.2;

l. to "promptly pay all of its lower tier subcontractors, suppliers and consultants for all materials and supplies furnished and for all work, labor and services performed . . .," Pretrial Stip., DE 74 at 3; Ex. 1 § 4.9.

Article 21.1 of the Subcontract provided that if B&B failed to comply, became unable to comply, or was going to become unable to comply with the above obligations, MWH could declare B&B in default of the Subcontract and supplement its work:

> In the event Subcontractor fails to comply, or becomes unable to comply, or with reasonable probability will become unable to comply, with any of the material provisions of this Subcontract, or in the event Subcontractor fails to supply a sufficient number of properly skilled workmen or sufficient supplies, materials, equipment, or fails to prosecute the Work with promptness and diligence, or in the event Subcontractor abandons its Work, and such failure, inability, or deficiency is not corrected within three (3) days after written notice by Contractor to the Subcontractor, Contractor may, in addition to and without prejudice to any other rights or remedies it may have, declare Subcontractor in default, terminate this Subcontract in whole or part, and/or take over and complete the performance of this Subcontract, at the expense of Subcontractor, or without taking over the Work, immediately and without notice to Subcontractor, furnish the necessary materials and labor, through itself or others, to supplement Subcontractor to remedy the situation, all at the expense of Subcontractor…
>
> In the event Contractor takes over the Work…With respect to expenses incurred by Contractor pursuant to this section, it is hereby agreed that the costs and expenses chargeable to Subcontractor as provided herein shall include, without restriction, all of the direct and indirect costs incurred by Contractor in performing Subcontractor's Work, the cost of supervision, administration, job overhead, travel, attorneys' fees, legal and accounting fees and expenses,

> Contractor's general and administrative costs, and a markup of 15% on such expenses. Upon any action by Contractor pursuant to this section, Subcontractor shall not be entitled to any further payment until the Work has been completed and accepted by the Owner and payment therefore has been received by Contractor from the Owner. In the event the unpaid balance due exceeds the expenses incurred by Contractor, the difference shall be paid to Subcontractor; but if such completion expense exceeds the balance due, Subcontractor agrees to promptly pay the difference to Contractor, and the Contractor shall have a lien upon all materials, tools, equipment taken possession of to secure such payment.

Pretrial Stip., DE 74 at 4; Ex. 1 § 21.1.

Article 4.7 of the Subcontract Supplemental Conditions provided that if B&B was likely to become unable to comply with or to perform its work or is delaying or in reasonable danger of delaying the Work, then MWH could withhold payments due to B&B:

> Notwithstanding anything to the contrary in this Subcontract, Contractor shall not be obligated to make payments to Subcontractor under this Subcontract:…(ii) when Subcontractor is or with reasonable probability may become unable to comply with or completely perform this Subcontract; (iii) whenever Contractor shall determine the Project is being delayed or is in danger of being delayed by the Work of the Subcontractor or by any failure of the Subcontractor to effect timely compliance with the requirements of the Subcontract Documents…

Ex. 1 § 4.7.

Article 22.1 of the Subcontract Supplemental Conditions provided that B&B was required to indemnify and hold harmless MWH for damages sustained by MWH arising from the work performed by B&B, including breaches of the Subcontract by B&B:

> TO THE FULL EXTENT PERMITTED BY LAW, SUBCONTRACTOR SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS…THE CONTRACTOR…FROM ALL LIABILITIES, CLAIMS, DAMAGES, LOSSES, CAUSES OF ACTION, COSTS AND EXPENSES, INCLUDING ATTORNEY FEES (COLLECTIVELY "CLAIMS"), ARISING OR ALLEGEDLY ARISING FROM THE WORK PERFORMED BY SUBCONTRACTOR OR FOR THE SUBCONTRACTOR'S ACCOUNT UNDER THIS SUBCONTRACT, INCLUDING BUT NOT LIMITED TO CLAIMS FOR BREACH OF THIS SUBCONTRACT BY SUBCONTRACTOR, CLAIMS FOR ANY ERROR, ACT, OMISSION OR NEGLIGENCE OF SUBCONTRACTOR…OR CLAIMS FOR…PROPERTY DAMAGES (INCLUDING LOSS OF USE THEREOF), ECONOMIC LOSS OR OTHER DAMAGES ARISING OR ALLEGEDLY

ARISING FROM SUBCONTRACTOR'S WORK.

Pretrial Stip., DE 74 at 4–5; Ex. 1 § 22.1.

### III. MWH Declares B&B in Default of the Subcontract

On March 17, 2014, B&B began working on the Project. Pretrial Stip., DE 74 at 5. Unfortunately, Winston Brown, the President and sole qualifier of B&B, passed away suddenly in early June 2015. *Id.* at 23:2–12, 73 at 89:16–22. 154:10–23. In the summer of 2015, B&B began falling behind schedule in its work.[3] After Mr. Brown's passing, B&B subsequently submitted no daily reports for June or July 2015. *Id.* at 18:5–10. B&B's July 2015 monthly payment application totaled only $6,750.00 worth of work. *Id.* at 22:9–14. B&B submitted no monthly payment application to MWH in August 2015. *Id.* at 22:24–23:1. B&B's August 2015 daily reports reflected an average manpower of only three to four B&B workers per day. Ex. 3N; Trial Tr. at 18:14–25. B&B's September 2015 payment application (which included August and September billing) confirmed that it only performed $19,397.86 worth of work. Ex.2O; Trial Tr. at 23:23–24:5. B&B's September 2015 daily reports reflected an average manpower of only three to four B&B workers per day. Ex. 3O; Trial Tr. at 19:17–25. B&B's October 2015 payment

---

[3] The County testified as follows regarding B&B's delays:

Q. Did it become clear at some point that Brown and Brown did not have enough workers manning the job to get their work completed in a timely fashion?
A. Yes, it was our opinion not enough resources were on the job to finish on time.
Q. And therefore, because those resources weren't being committed, was Brown and Brown therefore falling behind on schedule in completing the electrical work?
A. Yes.
Q. When did you begin to first notice that?
A. I believe each week we reviewed the construction schedules and the schedules would indicate how far ahead of schedule or behind schedule the project was, so I would say probably -- maybe at the 30, 40 percent complete stage we were knowing that there was a delay or schedule not being met.

Trial Tran. at 154:4–18.

application totaled only $19,200.00 worth of work. Ex. 2P; Trial Tr. at 24:14–20. B&B's October 2015 daily reports reflected an average manpower of only three to five B&B workers per day. Ex. 3P; Trial Tr. at 20:25–21:9.

From July to October 2015, MWH and B&B regularly discussed B&B's inability to complete the work and held several meetings with both field staff and Hermine Brown (B&B's new president). *Id.* at 20:3–24. In the meetings, MWH advised B&B that it was over 30 days behind schedule and that additional manpower and working on Saturdays would be required to recover the lost time associated with B&B's critical path activities. *See* Ex. 11. During the meetings, B&B specifically committed to having at least eight men on site full time, having Henry Brown (B&B's new project manager) on site full time, and having its crews work on Saturdays. *Id.*

As a result of B&B failing to abide by its commitments, on October 30, 2015, MWH served B&B with an official notice of its failure to perform work in a timely matter. Pretrial Stip., DE 74 at 5; Ex. 11. The letter confirmed B&B's failure to abide by its prior agreements and that B&B was over 30 days behind schedule. *Id.*

MWH continued to attend meetings with B&B, explaining the need for B&B to provide additional labor forces and for B&B to recover the schedule losses. Trial Tr. at 30:22–31:4. However, B&B continued to fail to do so. *Id.* at 30:4–11. B&B's daily reports for November 2015 reflected an average manpower of only three to five B&B workers per day. Ex. 3Q; Trial Tr. at 30:15–21.

As a result, on November 25, 2015, MWH sent B&B additional official notice of its failure to timely perform its work. Pretrial Stip., DE 74 at 5; Ex. 12; Trial Tr. at 31:11–18. The letter reflected again B&B's failure to abide by its prior agreements, and that by this time, B&B

7

was 56 work days behind schedule. Ex. 12.

On December 15, 2015, the County submitted a letter to MWH threatening to assess liquidated damages against MWH as a result of the Project delays, which the County stated had reached 67 days. Ex. 13. The County recommended overtime work or re-sequencing of activities in order to accelerate the schedule for completion. *Id.*; Trial Tr. at 159:4–7. At trial, the County testified that the electrical work that B&B was supposed to have performed at that point was still behind schedule. *Id.* at 160:1–3.

On December 22, 2015, MWH submitted yet another notice to B&B of its failure to perform its work within a timely manner. Pretrial Stip., DE 74 at 5; Ex. 14; Trial Tr. at 36:22–25. The letter again confirmed B&B's failure to abide by its agreement to add manpower, causing B&B to remain behind schedule. Ex. 14.

On December 31, 2015, MWH responded to the County's letter, notifying the County that the delays had been caused by B&B and their failure, among other things, to abide by their agreements to add manpower to the Project. Ex. 10. MWH also confirmed that B&B had committed to maintaining a crew size of 8 to 10 electricians and had promised to add 2 additional electricians starting January 4, 2016. *Id.*

Despite having increased its manpower temporarily the final week of December 2015, B&B's January 2016 daily reports reflected that it again failed to meet its manpower obligations in January. Ex. 3S; Trial Tr. at 41:19–42:19. MWH decided to declare B&B in default of the Subcontract under Article 21.1 and supplement its work with a licensed electrical contractor. Trial Tr. at 163:7–9. On January 12, 2016, MWH sent B&B a letter declaring B&B in default of the Subcontract. Pretrial Stip., DE 74 at 5; Ex. 15. The Declaration of Default recited B&B's history of failing to timely perform its work and stated, in part:

> MWHC will exercise its contractual right to 'immediately and without notice to the Subcontractor, furnish the necessary materials and labor, through itself for others to supplement Subcontractor to remedy the situation, all at the expense of Subcontractor…'
>
> MWHC will immediately begin supplementing B&B's work on the referenced Subcontract. MWHC will further backcharge B&B for all additional costs, expenses, claims, delays and any liquidated damages associated with B&B's default under this Subcontract.

Ex. 15.

## IV. MWH Supplements B&B's Work and Completes the Project

Six days after MWH's issuance of the Declaration of Default, on January 18, 2016, MWH entered into a contract with a licensed electrical subcontractor, Curry Controls Company ("Curry Controls"), who successfully performed portions of B&B's remaining scope of work under the Subcontract. Pretrial Stip., DE 74 at 5; Ex. 32; Trial Tr. at 163:12–14. Although B&B remained working on the Project, Curry Controls' scope of work was later expanded through change orders to include additional portions of B&B's work. Ex. 34, 35, 36, 37, 38, & 39; Trial Tr. at 117:16–19, 119:20–120:5. The County testified that the supplemental work force provided by Curry Controls assisted in accelerating the completion of the electrical scope of work on the Project, that once Curry Controls started working on the job, progress was made on getting the electrical work caught up to schedule, and that the County was encouraged once Curry Controls was on the Project. *Id.* at 163:15–25. Once sufficient progress was made so that the Project schedule was recovered and the electrical work was at the startup stage, Curry Controls pulled off their workers. *Id.* at 143:11–14, 164:3–6. Curry Controls' foreman remained working on the Project until August 18, 2016, when substantial completion was reached. Pretrial Stip., DE 74 at 6; Trial Tr. at 143:15–21, 164:7–10. Final completion of the Project was reached on February 16, 2017. Pretrial Stip., DE 74 at 6.

## V. Amounts Paid by MWH to B&B

The original Subcontract amount was $1,400,000. Pretrial Stip., DE 74 at 3; Ex. 1. The Subcontract value was later adjusted by five (5) bilateral, fully-executed change orders, and a sixth unexecuted change order,[4] which resulted in a final Subcontract value of $1,434,127.52. Pretrial Stip., DE 74 at 3. Of this amount, MWH has directly paid B&B a total of $999,893.57, *id.* at 6, leaving a remaining Subcontract balance of $434,233.95, Trial Tr. at 62:9–12.

## VI. Amounts Paid by MWH to Curry Controls

MWH and Curry Controls initially entered into a subcontract in the amount of $300,000. Pretrial Stip., DE 74 at 5. However, MWH and Curry Controls later executed six (6) change orders in order to have Curry Controls perform other portions of B&B's scope of work. *Id.*; Trial Tr. at 117:16–19, 119:20–120:5. Adjusted for these change orders, MWH paid Curry Controls a total of $467,273.99 for Curry Controls' performance of B&B's scope of work on the Project. Pretrial Stip., DE 74 at 5–6.

## VII. Amounts Paid by MWH to B&B's Lower-Tier Subcontractors and Suppliers

As a result of B&B's failure to pay its lower-tier subcontractors and suppliers, MWH directly paid eight (8) of B&B's lower-tier subcontractors and suppliers related to their work on the Project. Pretrial Stip., DE 74 at 6. A summary of MWH's payments to B&B's lower-tier subcontractors and suppliers are as follows:

| Payments to Lower Tiers | Amount |
| --- | --- |
| Gexpro | $117,973.47 |
| Graybar | $22,833.62 |
| JMC Ventures | $15,594.90 |
| ABC Concrete Cutting | $5,432.75 |
| Fire & Security Solutions | $12,116.24 |
| HD Supply | $137.59 |

---

[4] B&B has withdrawn its claim for payment of unexecuted Change Orders 7, 8, and 9. Pretrial Stip., DE 74 at 7.

| Lightning Protection Systems | $9,800.00 |
|---|---|
| World Electric Supply | $2,247.82 |
| **Subtotal** | **$186,136.39** |

*Id.*

## CONCLUSIONS OF LAW

**I.      B&B is liable to MWH for its breaches of the Subcontract.**

"Contracts are voluntary undertakings, and contracting parties are free to bargain for—and specify—the terms and conditions of their agreement." *Okeechobee Resorts, L.L.C. v. E Z Cash Pawn, Inc.*, 145 So. 3d 989, 993 (Fla. Dist. Ct. App. 2014). That freedom is a constitutionally protected right. *Id.*

Thus, "[i]t is not the function of the courts to rewrite a contract or interfere with the freedom of contract or substitute their judgment for that of the parties thereto in order to relieve one of the parties from the apparent hardship of an improvident bargain." *Marriott Corp. v. Dasta Const. Co.*, 26 F.3d 1057, 1068 (11th Cir. 1994) (citations omitted).

"Rather, the court's task is to apply the parties' contract as-written, not 'rewrite' it under the guise of judicial construction." *City of Pompano Beach v. Beatty*, 222 So. 3d 598, 600 (Fla. Dist. Ct. App. 2017) (citations omitted). "Where contracts are clear and unambiguous, they should be construed as written, and the court can give them no other meaning." *Gulliver Schs., Inc. v. Snay*, 137 So. 3d 1045, 1047 (Fla. Dist. Ct. App. 2014) (citations omitted).

Here, the Court finds nothing ambiguous about the Subcontract and the parties stipulated at trial that the Subcontract was clear and unambiguous, Trial Tr. at 13:25–14:16. The Subcontract provided, among other things, that "[MWH] shall have the right to decide the time and order that various portions of the Work shall be installed," that B&B shall "prosecute the Work in a prompt and diligent manner…at such time or times as [MWH] may direct," that "[t]ime is of the essence with respect to the performance of the Subcontract," and that B&B shall

11

"not by delay or otherwise, interfere with or hinder the work or progress of [MWH]." Ex. 1 §§ 3.1, 3.4.[5] If B&B was unable to comply with the schedule or MWH's directives, it was required to "notify [MWH] of its objection or inability to comply…within three (3) days of [MWH]'s issuance thereof."[6] *Id.* § 3.1. Moreover, if [B&B] believed it was entitled to additional time under the Subcontract to complete its work, the Subcontract required that "[B&B] shall file with [MWH], within three (3) days after occurrence of the circumstances giving rise to the alleged change, a written notice in the form of a change order request."[7] Ex. 1 § 11.2.[8]

At trial, B&B did not produce any evidence that it ever notified MWH of its inability to comply with the schedule or its directives or that B&B ever requested additional time from MWH to complete its work. By failing to make a proper request for an extension of time as required by the Subcontract, B&B waived any right it may have to enforce its legitimate contractual right. In short, the Subcontract defined the only remedy available to B&B, and B&B failed to pursue that remedy. *See Marriott Corp.*, 26 F.3d at 1068–70.

---

[5] In short, MWH had complete discretion to adjust the schedule as well as to demand that B&B comply with such adjustments. *See Marriott Corp.*, 26 F.3d at 1066 (applying similar contractual provisions):

> Thus, under the terms of the contracts, Marriott had absolute authority to modify the construction schedule, while Dasta was obligated to abide by Marriott's instructions. Although these terms may seem one-sided, Dasta was aware of these provisions at the time it bid the contracts, and had the opportunity to increase its proposed contract prices to account for the risks it would be assuming. Dasta failed to seize upon this opportunity, and, in hindsight, made a pair of improvident bargains from which we are powerless to grant relief.

[6] "In absence of such notice to [MWH], [B&B] agrees to accept for incorporation herein any and all orders, notices, directives, schedules or revisions thereof which may be issued from time to time by [MWH] to [B&B]." Ex. 1 § 3.1.

[7] "Failure to timely submit the required notice or to keep detailed, segregated time and costs records shall waive any claim by [B&B] to an extension of time." Ex. 1 § 11.2.

[8] The utility of a written request, or its functional equivalent, is that it would have provided MWH with a meaningful opportunity to evaluate the legitimacy of B&B's claim, and to determine whether B&B's request should be honored or rejected. *See Marriott Corp.*, 26 F.3d at 1067.

The evidence introduced at trial demonstrated that MWH was justified in concluding that B&B had become unable to comply with the Subcontract, had failed to supply a sufficient number of properly skilled workmen, and had failed to prosecute the Work with promptness and diligence, triggering MWH's right to supplement B&B's workforce under Article 21.1 of the Subcontract. Under Article 21.1, B&B agreed that if it:

> "fails to comply, or becomes unable to comply, or with reasonable probability will become unable to comply, with any of the material provisions of this Subcontract, or…fails to supply a sufficient number of properly skilled workmen or…fails to prosecute the Work with promptness and diligence…[and] such failure, inability, or deficiency is not corrected within three (3) days after written notice," MWH could "supplement Subcontractor to remedy the situation, all at the expense of Subcontractor."

Ex. 1.

B&B's argument that it was not provided proper notice is unavailing. MWH provided proper written notice to B&B on at least four separate occasions. *See* Ex. 11, 12, 13, & 14. The Subcontract did not require that MWH reference Article 21.1 or that it give notice that it was going to supplement prior to the default letter. *See* Ex. 1 § 21.1. B&B did not cure its failure to comply with the Subcontract within 3 days after receiving the written notices from MWH.[9] In fact, given that by January 12, 2016 the entire Subcontract time was already expired, it would have been impossible for B&B to cure at all.

---

[9] B&B's suggestion at trial that B&B could cure the default within the 3-day period by merely providing 8 workers on a given day within the 3-day period misreads Article 21.1. Even if B&B provided 8 workers, B&B would still not have corrected its failure to comply with the Subcontract because the Subcontract required that its work be in compliance with the Project schedule. B&B's scope of work was not in compliance with the Project schedule until at least the end of April, when startup and testing began and Curry Controls pulled its workers from the Project. Trial Tr. at 143:11–14, 164:3–6. *See L.K. Comstock & Co., Inc. v. United Engineers & Constructors Inc.*, 880 F.2d 219, 232 (9th Cir. 1989) (where a subcontractor was 12 weeks behind schedule, the contractor terminated the contract without giving the subcontractor 48 hours' notice as provided under the contract. The court held that the giving of notice was not required because the subcontractor could not have cured the 12-week tardiness within the 48-hour notice. Accordingly, the giving of notice was a futile gesture which was not required).

13

Because B&B did not cure within three days of the written notice, MWH was entitled to issue a default and supplement B&B's work under Article 21.1 of the Subcontract. *See* Ex. 1 § 21.1 ("In the event Contractor takes over the Work…With respect to expenses incurred by Contractor pursuant to this section, it is hereby agreed that the costs and expenses chargeable to Subcontractor as provided herein shall include, without restriction, all of the direct and indirect costs incurred by Contractor in performing Subcontractor's Work, the cost of supervision, administration, job overhead, travel, attorneys' fees, legal and accounting fees and expenses, Contractor's general and administrative costs, and a markup of 15% on such expenses."). This Clause unambiguously renders B&B liable to pay all costs MWH incurred in good faith relating to its supplementation of B&B's work. This includes all of MWH's payments to Curry Controls.

To the extent that B&B alleges that MWH also breached the Subcontract by failing to pay B&B subsequent to declaring B&B in default, MWH was entitled to hold those payments under Article 21.1 of the Subcontract, which provides that MWH may "declare Subcontractor in default…and/or take over and complete the performance of this Subcontract, at the expense of Subcontractor… Upon any action by Contractor pursuant to this section, Subcontractor shall not be entitled to any further payment until the Work has been completed and accepted by the Owner and payment therefore has been received by the Contractor from the Owner…if such completion expense exceeds the [Subcontract] balance due, Subcontractor agrees to promptly pay the difference to Contractor…" Ex. 1 § 21.1. *See also id.* § 4.7.

## II. B&B is further liable due to its failure to indemnify MWH

As a result of B&B's delays described above, B&B was also required under Article 22.1 of the Subcontract Supplemental Conditions to indemnify MWH for its damages, losses, costs and expenses arising from B&B's failure to timely perform its work. Article 22.1 expressly states that "[B&B] shall indemnify…[MWH]…from all…damages, losses,…costs and expenses,

including attorney fees…arising…from the work performed by [B&B] or for [B&B]'s account under this subcontract, including but not limited to claims for breach of this subcontract by subcontractor…or other damages arising…from subcontractor's work." [D.E. 75-1].

Because B&B breached the contract, causing damages, losses, costs and expenses to MWH, B&B is therefore liable to MWH for its failure to indemnify MWH for all damages, losses, costs, and expenses incurred.[10]

## III. MWH's Damages

Pursuant to the plain language of Article 21.1, when MWH supplemented B&B's work, B&B became liable to MWH for "all of the direct and indirect costs incurred by [MWH] in performing [B&B]'s Work, the cost of supervision, administration, job overhead, travel, attorneys' fees, legal and accounting fees and expenses, [MWH]'s general and administrative costs, and a markup of 15% on such expenses." Ex. 1 § 21.1. MWH paid $467,273.99 to Curry Controls to supplement B&B's work. Pretrial Stip., DE 74 at 6. Including the 15% markup owed by B&B on those payments pursuant to Article 21.1, the amount owed by B&B to MWH as to Curry Controls' work totals $537,365.09.[11]

Additionally, MWH paid $186,136.39 to B&B's lower-tier subcontractors and suppliers. Pretrial Stip., DE 74 at 6. Pursuant to Article 21.1 of the Subcontract, B&B is liable to MWH for the full amount of these payments. Ex. 1 § 21.1.

Because MWH retained $434,233.95 of the B&B Subcontract balance to use toward

---

[10] Although B&B alleges Article 22.1 of the Subcontract is void pursuant to § 725.06(2) and (3), Fla. Stat. (2013), "§ 725.06 only applies to indemnification clauses where the indemnitee is seeking indemnification for its own negligence." *Great Divide Ins. Co. v. Amerisure Ins. Co.*, No. 17-CV-14271, 2018 WL 1318340, at *6 (S.D. Fla. Mar. 14, 2018). Because MWH is not seeking indemnification as a result of its own negligence, Fla. Stat. § 725.06 is inapplicable to the facts of this case.

[11] Although B&B alleges that MWH failed to mitigate its damages by overpaying Curry Controls, the Court finds that the payments made to Curry Controls were made in good faith and that B&B has produced no evidence of waste or extravagance.

payment of Curry Controls' and B&B's lower-tier subcontractors and suppliers, B&B is entitled to a credit offset of the Subcontract balance against MWH's damages. Subtracting the $434,233.95 Subcontract balance from the $537,365.09 owed to MWH related to Curry Controls and the $186,136.39 owed to MWH related to B&B's lower-tier subcontractors and suppliers, the total amount owed by B&B to MWH equals $289,267.53.

## CONCLUSION

It is hereby **ORDERED and ADJUDGED** that:

1. Plaintiff, MWH Constructors, Inc. shall recover from Defendant, Brown and Brown Electric, Inc. in the principal amount of $289,267.53,[12] which shall continue to bear interest, pursuant to Section 55.03, Florida Statutes, at the statutory rate as of the date of this Final Judgment and for which let execution issue forthwith.

2. Brown and Brown Electric, Inc. shall take nothing under the Counterclaim dated October 20, 2017 from MWH Constructors Inc.

3. The court reserves jurisdiction to determine issues related to the reasonable amount of attorney's fees and costs.

---

[12] MWH has not met its burden to prove that it is entitled to prejudgment interest. "[T]he beginning date for the accrual of prejudgment interest depends on the timing of the pecuniary loss for which damages have been awarded, not the type of action the plaintiff has brought. Whether the case sounds in tort or contract, when prejudgment interest is proper, it is to be awarded from the date of the plaintiff's actual loss, be that loss a diminution in the value of the plaintiff's property, a payment the plaintiff has made to a third party, or some other form of pecuniary loss for which prejudgment interest is authorized." *Arizona Chem. Co. v. Mohawk Indus., Inc.*, 197 So.3d 99, 104 (Fla. Dist. Ct. App. 2016) (citations omitted). In its proposed order, MWH suggests that it is entitled to prejudgment interest from the date it declared B&B in default. It has not, however, met its burden to show that this date is the date of its actual loss. The Court could use the date of the last invoice from Curry Controls as the date from which prejudgment interest should accrue. This appears to be February 7, 2017. *See* DE 40G. The record, however, does not indicate when MWH paid B&B's subcontractors.

4. MWH shall submit a proposed final judgment to Rosenberg@flsd.uscourts.gov by May 8, 2018.

5. The Clerk of Court shall **CLOSE** this case.

**DONE and ORDERED** in Chambers at West Palm Beach, Florida, this 4th day of May, 2018.

_____
ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to: All counsel of record via CM/ECF